

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00321-CV

_____

IN THE INTEREST OF A.C., D.C., AND L.C., CHILDREN

---

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-460107-09

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant G.C. (Mother) appeals the trial court's order terminating her parental rights to her children, A.C., D.C., and L.C. (the Children).[1] In five issues, Mother contends that the evidence was legally and factually insufficient to support the termination of her parental rights under Family Code Subsections 161.001(b)(1)(D), (E), (N), and (O); that the evidence was legally and factually insufficient[2] to support the trial court's finding that termination of Mother's parental rights is in the Children's best interest; and that the trial court erred by denying Mother's motion for continuance.

We hold that the evidence was legally and factually sufficient to support the termination of Mother's parental rights under Subsections 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We also hold that the evidence was legally and factually sufficient to support the trial court's best-interest finding. *See id.* § 161.001(b)(2). And we overrule Mother's issue related to the trial court's denial of her motion for continuance. Accordingly, we affirm the trial court's order terminating Mother's parental rights to the Children.

---

[1]The father of the Children, O.M., signed an affidavit of voluntary relinquishment of parental rights, and accordingly, his parental rights were terminated under Family Code Subsection 161.001(b)(1)(K). O.M. has not appealed the trial court's order terminating his parental rights.

[2]Although Mother's brief identifies this issue as a factual-sufficiency challenge, her argument incorporates some language addressing legal sufficiency. In the interest of justice, we review the evidence under both legal- and factual-sufficiency standards.

# I. Background

On December 31, 2020, the Texas Department of Family and Protective Services (TDFPS) received a report that there had been allegations of neglectful supervision of the Children due to domestic violence and that there had been allegations of physical abuse due to claims that Mother had hit L.C. Regarding the physical abuse, the allegation was that Mother and her mother (maternal grandmother) got into a verbal argument because maternal grandmother would not allow Mother to use her phone. When Mother attempted to grab the phone from maternal grandmother's hand, Mother purportedly hit L.C. in the face. Maternal grandmother then called the police, and Mother received a citation for offensive conduct.

## A. TDFPS's Investigation

On January 3, 2021, TDFPS investigator Kimberly Holloway went to Mother's residence[3] to follow up on the report; Mother was not home. On January 6, 2021, Holloway returned to the home and spoke to maternal grandmother, who stated that Mother had been drinking and was on drugs.

On January 7, 2021, Holloway finally met with Mother at the home. Mother denied hitting L.C. and asserted that maternal grandmother was lying, but she admitted that she had frightened L.C. by throwing an object across the room. When

---

[3]At that time, Mother, maternal grandmother, and the Children all lived together in the home.

asked about the domestic-violence incident, Mother told Holloway that her boyfriend had punched her and had broken her ribs, though she would not provide the boyfriend's name[4] or confirm whether they were still involved. At trial, Holloway testified that although she did not see Mother's ribs, she observed that Mother would continually wince in pain and hold her ribs.

### 1. Concerns of Drug Use

Mother told Holloway that she had a child previously taken from her care[5] due to prior drug use and that the child had not been returned to her care. Mother admitted that she had a history of using cocaine two to three times per week. She denied any current drug use. Holloway testified that because of Mother's "questioning behaviors" and history of drug use, she asked Mother to submit to a drug test. Specifically, Holloway testified that Mother appeared to have difficulty maintaining focus, and her behavior would suddenly shift from cooperative to very hostile. According to Holloway, Mother's behavior suggested drug use. Despite concerns of drug use, Mother refused Holloway's drug testing requests.

### 2. Mother's Criminal History and Propensity for Family Violence

As part of TDFPS's investigation, Holloway pulled local police reports involving Mother. Between May 2019 and December 2020, there had been eleven

---

[4]Holloway later discovered, through another domestic incident, that Mother's boyfriend was O.R.

[5]The child previously taken from Mother's care is not one of the Children involved in this suit.

police reports, including Mother's arrests for active warrants, a family-violence incident between Mother and her brother, Mother being the victim of threats and harassment, a domestic-violence assault against Mother by her boyfriend, a knife fight between Mother and another female adult, and Mother shoplifting. Mother had also been arrested for possession of marijuana and possession of a controlled substance.

Additionally, Mother's criminal history contains several family-violence charges, including aggravated assault with a weapon against a family member, bodily-injury assault against a family member, and family-violence assault. At trial, as evidence of domestic violence, TDFPS offered two indictments against Mother. Mother was indicted—and ultimately convicted—of family-violence assault against both her father (maternal grandfather) and maternal grandmother.

### 3. Mother's History with TDFPS

Holloway testified that Mother had an extensive history with TDFPS related to the Children. Specifically, there had been several allegations of neglectful supervision of the Children involving Mother's testing positive for illegal drug use,[6] domestic

---

[6]Mother had tested positive for using cocaine and methamphetamines during multiple TDFPS investigations, including once while pregnant with L.C. In a 2017 investigation, TDFPS determined that Mother "cannot provide adequate supervision to the [C]hildren while under the influence of illegal substances." Mother had denied using illegal substances, but she then tested positive for cocaine. Those allegations of neglectful supervision of the Children were found "reason to believe," and TDFPS determined that Mother had placed the Children at a substantial risk of harm. Mother subsequently refused further drug testing requests from TDFPS.

violence that had occurred in the presence of the Children, Mother's alleged violent behavior in front of the Children, threats by Mother against maternal grandmother and maternal grandfather in front of the Children, and Mother's incarceration. Several of the neglectful-supervision allegations were disposed by TDFPS as "reason to believe."

### 4. Interviews of A.C. and D.C.

On January 7, 2021, Holloway interviewed A.C. and D.C. at the home. Both A.C. and D.C. told Holloway that Mother and maternal grandmother would often hit them and L.C. A.C. stated that maternal grandmother would hit her and her brothers with a hard stick. A.C. also stated that maternal grandmother had told A.C. that when A.C. was asleep, she was going to put a pillow over A.C.'s head and that she wanted to kill A.C. Maternal grandmother had also purportedly threatened to punch A.C. in the face. At trial, Holloway testified that while she interviewed A.C., A.C. kept her head down and appeared to be "a very sad, sad child." Holloway had also observed that A.C. had "a pretty significant amount" of what appeared to be bug bites all over her arms and legs. A.C. told Holloway that she had gotten them from lying on the bed in maternal grandmother's room.

---

Two investigations involved Mother's incarceration due to a drug charge, one of which occurred because Mother's probation had been revoked after she tested positive for cocaine. Because the Children had been left in maternal grandmother's care while Mother was incarcerated, TDFPS closed those investigations.

D.C. was also described as a "very sad child." Holloway testified that D.C. kept his head down during his interview and made "matter-of-fact" statements describing abuse and fighting in the home. He told Holloway that Mother would hit him on the arm and would slap his sister on her cheek or arm. He had also witnessed maternal grandmother throw a metal spray bottle at A.C. When Holloway asked D.C. if he felt safe in the home, he responded that he did not know. In addition to Mother's and maternal grandmother's physical abuse, D.C. told Holloway that his uncle—who frequently visited the home—would hit him and his siblings and that maternal grandmother would not do anything about it. On one occasion, the Children's uncle threw D.C. onto the bed, pulled his pants down, and then hit him and his siblings. Further, D.C. stated that his uncle frequently hit maternal grandfather in front of the Children.

Holloway testified that while she was at the home interviewing A.C. and D.C., it was "complete chaos." Mother and maternal grandmother had been arguing, which Holloway described as "constant, constant yelling." Although Holloway asked Mother and maternal grandmother to stop, the behavior continued. Holloway asked A.C. if the behavior was normal, and A.C. confirmed that was "how it [wa]s in the[ir] home." Both A.C. and D.C. stated that Mother and maternal grandmother would fight all the time, all day long. Both children told Holloway that the police had been called to their home several times.

**5. Mother's Cooperation with TDFPS**

Mother admitted knowing that maternal grandmother had threatened to kill A.C. but denied knowledge of maternal grandmother hitting the Children. She told Holloway, however, that she felt like the Children should not be left with maternal grandmother. Mother also told Holloway that she often did not stay at the home and would spend the night elsewhere because she did not want to be there, but she would leave the Children there. Holloway discussed with Mother that her home was not a good environment for the Children and encouraged Mother to find alternate housing for the Children.

Before Holloway left Mother's home on January 7, 2021, Mother asked Holloway what would happen if she wanted to give up custody of the Children. Holloway explained the process of voluntarily relinquishing parental rights, but Mother was "hesitant." Mother eventually stopped cooperating with TDFPS. When Holloway later returned to the home, Mother had locked herself, A.C., and D.C. inside the home, locking maternal grandmother and L.C. out. She then sent text messages to Holloway that she was changing her plan and that Holloway was "dismissed." Concerned for Mother's mental health and the Children's safety, Holloway called the police. When the police arrived, they discovered that Mother had blocked the door to prevent it from opening with a key.

## B. Removal of the Children

On January 31, 2021, the police informed Holloway that there had been a domestic-violence incident at the home involving Mother and her boyfriend—the same boyfriend, O.R., from the previous domestic-violence assault. Mother and O.R. had gone "at each other with a machete" while the Children were present. Mother had called the police, and when the police arrived, a young child brought the machete out of the house and gave it to the police. A neighbor had reported seeing Mother chase O.R. out of the home with a machete. Holloway testified that according to the police, A.C. had walked into the room during the incident, both Mother and O.R. had sustained injuries, and O.R. was arrested for family violence. Mother had also reported to the police that O.R. would rape her, but she still allowed him to stay in the home.[7]

Holloway later interviewed D.C. about the incident, which escalated her concerns of domestic violence in the home. D.C. told Holloway that he had witnessed the machete incident, though he later stated that he had been in a different room in the home and that Mother only told him what happened when he saw her injuries. D.C. asserted that O.R. had cut Mother with the machete and that he saw where she was cut. He also told Holloway that Mother and O.R. had been fighting "with their

---

[7]Mother had allowed O.R. to move into the home she shared with maternal grandmother and the Children.

words" prior to the incident. O.R. was eventually indicted for this domestic-violence incident.

Holloway testified that after she spoke to D.C., Mother reached out and told Holloway to stop going to her home, to stay away from her children, and to leave her family alone. When Holloway asked Mother if she would be willing to place the Children outside of the home, Mother responded that she would "thin[k] on that." TDFPS subsequently filed its petition, and the Children were removed from Mother's care on February 5, 2021.

## C. Mother's Service Plan

As part of its efforts to reunite the Children with Mother, TDFPS developed a service plan for Mother. Mother's required services included a Focus for Mothers parenting course, a psychosocial evaluation, individual counseling, a drug and alcohol assessment, a mental health evaluation, and a domestic-violence-awareness session. Additionally, Mother was required to submit to random drug testing, attend parent–child visits, locate and maintain a safe and stable home environment for the Children, maintain stable employment, and refrain from illegal activity.

At trial, permanency specialist Mary Davis testified that Mother failed to comply with her service plan. Mother had refused to meet with her caseworker to develop her service plan. When Mother later received her service plan, she ripped it up in front of her caseworker. By August 2021—six months after removal—Mother had not started any services. Mother indicated that she did not believe the services

were necessary and refused to cooperate. At the time of trial, the only service Mother had completed was the Focus for Mothers parenting course.

Although she had been asked—and was required—to submit to several random drug tests, Mother refused all drug testing requests by TDFPS. Per Mother's service plan, her failure to comply with those drug testing requests resulted in several presumed-positive test results. Additionally, Mother's attendance at parent–child visits was inconsistent, and she missed several scheduled visits. Of the few visits she attended, some were ended early by TDFPS due to Mother cursing at the Children, calling them names, and speaking inappropriately in Spanish without an interpreter present.[8] Mother also failed to provide pay stubs, job interview information, or other proof of employment.

Additionally, Davis testified that Mother's home remained an unsafe environment for the Children. After removal, Mother continued living in the same home with maternal grandmother, and approximately ten months later, police responded to another domestic-violence assault at the home.[9] Further, Mother would

---

[8]Mother had rejected Davis's offers to have a Spanish-speaking interpreter present during the visits.

[9]On November 23, 2021, Fort Worth police officer Benjamin Wright responded to Mother's home because Mother had been the victim of domestic violence by her boyfriend, O.R.—the same boyfriend from the other domestic-violence assaults with whom Mother had been in a dating relationship for two years. In this incident, O.R. grabbed Mother around her throat, shoved her onto the ground, and choked her. Officer Wright subsequently petitioned for a protective order on Mother's behalf, but she refused to sign it. He testified that Mother was upset with the

not allow Davis to enter the home to determine if Mother could demonstrate the ability to provide a safe environment for the Children.

## D. The Children's Foster Placements

The Children were initially placed in the same foster home together. At the time of removal, A.C., who was in sixth grade, was determined to be at a second grade reading level, and she had a speech impairment. D.C., according to his treatment plan, had experienced gaps in learning due to irregular access to school prior to removal. L.C., who had never attended school, was placed in kindergarten and was "significantly" behind his peers. And at the time of removal, L.C. had not been potty trained.

Based on assessments of the Children's individual needs, each child began attending individual counseling. A.C. began to learn coping skills and ways to help her regulate her emotions, and she was placed in speech therapy and special education classes. D.C. learned coping skills and how to process his past trauma. L.C. began behavioral therapy to help him handle his emotions and his aggression toward his siblings. After only one month in TDFPS custody, the Children's individual needs, development, and education had already improved. The Children's Court Appointed Special Advocate (CASA) reported that the Children were adjusting well to their placement and seemed to bond with their foster family. However, a few months after

---

police for taking too long; she stated that O.R. had "gotten away in the past" because officers did not respond quick enough when she called the police for previous incidents. O.R. was eventually indicted for the November 23, 2021 incident.

removal, A.C. was discharged from the foster home she shared with her brothers due to behavioral concerns, and she was placed in a residential treatment center. She was then placed with several different foster families. At time of trial, A.C. had been through five different foster placements.

Davis testified that A.C. had severe behavioral issues rooted in the trauma she had witnessed while in Mother's care. She was diagnosed with mixed anxiety and depressed mood, and at times, A.C. could be very hostile and aggressive towards men and young boys, including her brothers. Davis testified that A.C. needed—and continues to need—time to heal from her past trauma and to address her behavioral concerns. TDFPS had been working with experienced behavioral and trauma therapists to help A.C. work through her trauma. The foster mother in A.C.'s most recent placement—an all-female environment—advocated for A.C. and expressed that she wanted to continue to help A.C. heal. Davis testified that if A.C. were returned to Mother's care, she would not be able to successfully address her trauma or move past her issues.

As for D.C. and L.C., Davis described their progress since removal as "night and day." D.C. and L.C.'s foster parents had ensured that they attended school regularly and received learning accommodations. L.C., who was very delayed and almost nonverbal at the time of removal, could speak freely about his interests and draw pictures in great detail. He had been "doing great and thriving" in school. D.C. began opening up and talking about his feelings, and he had shown great

improvement handling anger. Further, D.C. and L.C.'s foster mother had committed to adopting them. Davis testified that she had no concerns regarding their foster mother's ability to meet their needs as they grow.

## II. Discussion

On appeal, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings that she had knowingly placed or had knowingly allowed the Children to remain in conditions or surroundings that endangered their physical or emotional well-being, that she had engaged in conduct that endangered the Children's physical or emotional well-being, that she had constructively abandoned the Children, that she failed to comply with her service plan, and that termination of her parental rights is in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (b)(2). Mother also argues that the trial court had no discretion to deny her request for a continuance.

### A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination—here, TDFPS—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth

14

of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that TDFPS

15

proved the specific grounds for termination under Family Code Subsections 161.001(b)(1)(D) and (E) and that the termination of the parent–child relationship is in the Children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Termination Under Subsections 161.001(b)(1)(D) and (E)

Mother argues that the evidence is legally and factually insufficient to support termination of her parental rights under Family Code Subsections 161.001(b)(1)(D) and (E). We disagree.

### 1. Applicable Law

Under Subsections (D) and (E), the trial court may terminate a parent's rights if it finds by clear and convincing evidence that the parent has

> (D)  knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

> (E)  engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under Subsection (D), it is necessary to examine

16

the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The conduct of a parent in the home can create an environment that endangers the child's physical and emotional well-being. *Id.* For example, "abusive or violent conduct by a parent or other resident of a child's home" may produce an endangering environment. *Id.* Illegal drug use or drug-related criminal activity by the parent "likewise support[] the conclusion that the child[]'s surroundings endanger [his or her] physical or emotional well-being." *Id.*

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. The endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312 (quoting *Boyd*, 727 S.W.2d at 533). The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). Illegal drug use and its effect on the

17

parent's life and her ability to parent may establish an endangering course of conduct. *Id.* Criminal activity that exposes the parent to incarceration may also endanger a child. *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those Subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

## 2. Analysis

Here, Mother had a history of drug use that had affected her ability to provide adequate supervision and placed the Children at a substantial risk of harm, and her questionable behavior led TDFPS investigator Holloway to believe she was still using illegal drugs. Mother refused to cooperate with TDFPS—both before and after removal—and refused to comply with her service plan regarding drug testing even though she knew her parental rights were in jeopardy. Instead, she expected TDFPS—and consequently, the trial court—to take her at her word when she claimed that she was no longer using illegal drugs despite her TDFPS history of making the same claims and then testing positive for drug use.

Contrary to Mother's argument that there was no evidence that Mother was "actively using illegal drugs during the pendency of the case," the record shows that

18

Mother's refusals to submit to drug testing during this case's pendency resulted in several presumed-positive results. Moreover, the trial court may infer from these refusals that Mother was using drugs. *See In re B.P.*, No. 09-22-00031-CV, 2022 WL 2251739, at *9 (Tex. App.—Beaumont June 23, 2022, no pet.) (mem. op.) (holding trial court could have inferred from parent's refusal to take drug tests that she was using drugs); *In re D.A.*, No. 02-15-00213-CV, 2015 WL 10097200, at *5 n.6 (Tex. App.—Fort Worth Dec. 10, 2015, no pet.) (mem. op.) (similar); *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) (similar). Accordingly, Mother contributed to the creation of a dangerous environment for the Children, which continued even after removal. *See B.P.*, 2022 WL 2251739, at *9 (noting parent's continued narcotics use after child's removal is conduct that jeopardizes parental rights and may support an endangering course of conduct); *In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.) ("[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct . . . which by its nature, endangers a child's well-being."); *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (similar).

Additionally, the record reflects that the Children were exposed to extensive domestic violence and disturbances in the home. TDFPS investigator Holloway testified that there had been a pattern of domestic violence involving Mother—as both the perpetrator and the victim. Prior to removal, there were at least two instances of domestic violence against Mother by her boyfriend, O.R. The domestic-

19

violence incident involving a machete, for example, occurred in the home while the Children were present; D.C. was able to relay explicit information about the attack. That Mother was a victim of domestic violence by her boyfriend, O.R., has no bearing on whether she exposed the Children to an endangering environment. *See J.T.G.*, 121 S.W.3d at 125. Indeed, despite knowing of O.R.'s propensity for domestic violence, including alleged rape, Mother allowed him to move into the home with the Children, allowed him to continue living there, and refused to remove the Children from that home.

Mother's argument that there was no evidence she committed "any act of domestic violence" is likewise unsupported by the record. In addition to O.R.'s acts of domestic violence, Mother herself perpetrated domestic violence in the home. Mother's criminal history primarily consists of domestic violence, including convictions for family-violence assaults she had committed in the home in front of the Children. Further, Mother's history with TDFPS implicates Mother; Holloway testified that the domestic violence that had occurred in the home constituted, in part, "reason to believe" the allegations of neglectful supervision.

In addition to a pattern of domestic violence, Mother's and maternal grandmother's behavior and general lack of self-control contributed to an endangering environment. *See In re R.R.A.*, 654 S.W.3d 535, 548 (Tex. App.—Houston [14th Dist.] 2022, pets. filed) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."); *In re L.D.C.*, 622 S.W.3d

63, 72 (Tex. App.—El Paso 2020, no pet.) (similar); *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) (similar). Holloway described her home visit as "complete chaos" due to Mother and maternal grandmother's arguing and yelling, which A.C. stated was normal. Holloway testified that this was very concerning, as the excessive fighting caused Mother and maternal grandmother to focus on each other instead of supervising the Children. Despite the extensive domestic violence and disturbances that had occurred in the home, including Mother's own behavior and violence, she allowed the Children to remain in that home and failed to take any action to remove them from that environment.

The record also shows that Mother failed to protect the Children from physical abuse—by both her own conduct and by placing the Children with and allowing them to remain under the care of physically abusive persons. A.C. and D.C. told Holloway that both Mother and maternal grandmother would often hit the Children in various places on their bodies using their hands or a stick or by throwing objects at the Children. Further, maternal grandmother threated to suffocate A.C., punch A.C. in the face, and kill A.C. In addition to the abuse by Mother and maternal grandmother, the Children were physically abused by and witnessed abuse from their uncle, who Mother and maternal grandmother would frequently allow into the home and from whom Mother and maternal grandmother failed to protect the Children.

Mother was aware of the violence happening in the home. Mother admitted to Holloway that she knew maternal grandmother had threatened to kill A.C. She may

21

have denied knowledge of maternal grandmother hitting the children, but Mother acknowledged that the Children should not be with maternal grandmother. And A.C.'s and D.C.'s interviews with Holloway suggest there had been extensive physical abuse by Mother, maternal grandmother, and their uncle. Accordingly, Mother contributed to creating a dangerous environment for the Children and further exposed them to an endangering environment by failing to remove them from that home or from maternal grandmother and their uncle.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed the Children to remain in conditions or surroundings that endangered their emotional or physical well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). And we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct that endangered the Children's physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

After reviewing the entire record, giving due deference to the factfinder's endangering-environment and endangering-conduct findings and without supplanting the factfinder's judgment with our own, we hold that a factfinder could reasonably form a firm conviction or belief that (1) Mother had knowingly placed or knowingly

22

allowed the Children to remain in conditions or surroundings that endangered their emotional or physical well-being, (2) Mother had engaged in conduct that endangered the Children's physical or emotional well-being, or (3) Mother exposed the Children to others whose conduct endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). Accordingly, we overrule Mother's issues regarding termination under Subsections (D) and (E). *See id.*

Because a finding of only one ground alleged under Family Code Section 161.001(b)(1) is sufficient to support termination, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not reach Mother's issues regarding termination under Subsections 161.001(b)(1)(N) and (O).

## C. Best Interest of the Children

Mother challenges the sufficiency of the evidence supporting the trial court's determination that termination of Mother's parental rights is in the Children's best interest. For the reasons set out below, we overrule this issue.

### 1. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be

23

the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is

24

in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**2. Analysis**

Regarding the Children's emotional and physical needs now and in the future and the emotional and physical danger to them now and in the future, the record reflects, as detailed above, that there had been a continuing pattern of domestic violence involving Mother—as both the victim and the perpetrator. Mother had been the victim of domestic violence by her boyfriend, O.R., several times, yet she allowed O.R. to continue living in the home she shared with the Children. Even after removal, the domestic violence in that home continued. While O.R. may have been incarcerated at the time of trial and thus physically unable to be around Mother and the Children, as Mother suggests on appeal, O.R. was not the only perpetrator of domestic violence. As detailed above, the Children's uncle and Mother herself had also committed several acts of domestic violence in the home, and Mother allowed the Children to be around that violence. A factfinder may measure a parent's future conduct by her past conduct, and the trial court could have inferred that a pattern of domestic violence involving Mother would continue now and in the future. *See In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 226 (Tex. App.— Waco 2015, pets. denied).

25

The trial court could have likewise inferred that Mother's illegal drug use, as detailed above, was likely to continue. Because Mother (1) had a history of drug use that affected her ability to provide adequate supervision and placed the Children at a substantial risk of harm, (2) displayed questionable behaviors suggesting current drug use, and (3) refused to submit to drug testing even though she knew her parental rights were in jeopardy, the trial court could have inferred that Mother did not have the ability to meet the Children's physical and emotional needs now and in the future. *See R.H.*, 2019 WL 6767804, at \*5 ("The trial court could have inferred from [parent's] past history of instability, criminal conduct, and drug use that [parent] did not have the ability to meet [child's] physical and emotional needs in the future.").

The record also reflects, as detailed above, that while in Mother's care, the Children had developed severe emotional trauma and behavioral issues and were educationally underdeveloped. In contrast, after removal, the Children's individual emotional and educational needs were addressed and began to improve just one month after removal. At the time of trial, D.C. and L.C., whose progress since removal was described as "night and day," had been in the same foster placement together since removal, and their foster mother had committed to adopting them. While A.C. had been through five different foster placements, she was eventually placed in a home that would best meet her emotional and developmental needs. And A.C.'s foster mother supported A.C. and expressed that she wanted to continue to

26

help A.C. heal. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to the Children.

With respect to the plans for the Children and the stability of the home or proposed placement, the record shows that Mother had no plans to locate and secure a safe, stable home environment for the Children. Holloway had discussed with Mother that her home was not a good environment for the Children, and Mother acknowledged that the Children should not be with maternal grandmother. However, at the time of trial, Mother still lived with maternal grandmother in the same home from which the Children had been removed.

The record establishes that while the case was pending in the trial court, Mother—who had already considered voluntarily relinquishing her parental rights— did not appear to desire or otherwise show any motivation for reunification with the Children. Although compliance with her service plan was required for reunification, Mother indicated she did not believe that the services were necessary. Indeed, she did not participate in services in any significant way. Mother failed to take the necessary steps to have the Children returned to her care, and she had not addressed the concerns that led to the Children's removal. And despite being made aware of the trial that would permanently impact her rights concerning the Children, Mother did not attend her termination trial. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to the Children.

27

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and the Children was in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's challenge to the trial court's best-interest finding.

## D. Denial of Mother's Motion for Continuance

Mother's trial counsel orally requested a continuance on Mother's behalf when Mother did not show up for trial. The trial court denied the continuance and proceeded to trial without Mother. On appeal, Mother argues that the trial court had no discretion to deny the motion and that the denial harmed Mother.

### 1. Standard of Review and Applicable Law

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the

appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A motion for continuance shall not be granted without "sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. Thus, a trial court generally does not abuse its discretion when it denies an oral motion for continuance. *See id.*; *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *In re J.P.-L.*, 592 S.W.3d 559, 575 (Tex. App.—Fort Worth 2019, pet. denied) (finding no abuse of discretion); *In re M.A.-O.R.*, No. 02-11-00499-CV, 2013 WL 530952, at *5 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem. op.) (holding no abuse of discretion when pro se mother made an oral motion for continuance just before the termination trial began).

### 2. Analysis

Mother did not file a written motion for continuance or otherwise comply with the requirements of Rule 251. *See* Tex. R. Civ. P. 251. On appeal, she argues that, regardless, her oral motion for continuance should be permissible as sworn evidence because TDFPS did not object to the motion.[10] Mother therefore contends the facts alleged in the motion were uncontroverted, and the trial court had no discretion to

---

[10]However, the one case Mother cites in support of this contention is inapplicable, as it addresses the failure to object to an attorney's unsworn statements as evidence and does not involve a continuance motion—oral or written. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997).

reject those uncontroverted facts. With respect to those facts, permanency specialist Davis testified that on the morning of trial, Mother told her she would not be able to appear. Mother had stated that she overslept and that she did not have anything to wear. She had also indicated that maternal grandmother and maternal grandfather were somehow to blame for her lack of attendance. However, Davis testified that she had been in communication with Mother, who—the day before trial—confirmed that she would be available and that she planned to attend the trial setting. Additionally, the trial court heard evidence that since the last setting before the trial court, Mother had not progressed on her service plan or parent–child visits.

Mother asserts—without supporting authority[11]—that because the facts of Mother's motion for continuance were uncontroverted, the trial court had no discretion to deny the motion. Contrary to Mother's argument, there is no evidence in the record that the trial court rejected these facts—controverted or not. Rather, the trial court denied Mother's motion for continuance after hearing that she failed to appear because she overslept and had nothing to wear and that she had not made any progress on her service plan or visitations. Moreover, TDFPS filed with the trial court a return of citation showing that Mother had been personally served. The trial court took judicial notice—without objection from Mother's trial counsel—that Mother and

---

[11]The two remaining cases Mother cites in support of this issue are inapplicable because they involve written motions for continuance, not oral. *See generally Verkin v. Sw. Ctr. One, Ltd.*, 784 S.W.2d 92 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *Garza v. Serrato*, 699 S.W.2d 275 (Tex. App.—San Antonio 1985, writ refused n.r.e.).

her trial counsel had received notice of the trial setting. "[A] party's mere absence does not entitle her to a continuance." *J.P.-L.*, 592 S.W.3d at 575; *In re A.L.P.*, No. 01-19-00144-CV, 2019 WL 3949461, at *4 (Tex. App.—Houston [1st Dist.] Aug. 22, 2019, pet. dism'd) (mem. op.); *Erback v. Donald*, 170 S.W.2d 289, 291–92 (Tex. App.—Fort Worth 1943, writ ref'd w.o.m.) (explaining absent party must show that she had a reasonable excuse for failing to appear and that her absence prejudiced her). And the trial court had already granted a six-month extension requested by TDFPS. In light of all the evidence before the trial court—and of Mother's failure to comply with Rule 251—we cannot say that the trial court abused its discretion by denying Mother's motion.

Accordingly, we hold that the trial court did not abuse its discretion by denying Mother's motion for continuance. We therefore overrule Mother's issue regarding the denial of the motion.

## III. Conclusion

Having overruled Mother's issue regarding termination under Subsections 161.001(b)(1)(D) and (E), Mother's challenge to the trial court's best-interest finding, and Mother's issue related to her motion for continuance, we affirm the trial court's order terminating Mother's parental rights to the Children.

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered: January 26, 2022

31